

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
03/02/2010

| | | |
|---|---|---|
| IN RE: | § | Case No. 08-36327 |
| JEFFREY A. SHANKMAN, | § | Chapter 7 |
| Debtor(s). | § | Judge Isgur |

## MEMORANDUM OPINION

### *Background*

On October 5, 2008, Jeffrey A. Shankman filed a petition under chapter 7 of the Bankruptcy Code. Lowell T. Cage was appointed as Shankman's chapter 7 trustee ("Trustee"). Over the next several months, four separate and mostly unrelated adversary proceedings were filed against Shankman contesting the dischargeabilty of certain debts under 11 U.S.C. § 523(a)(2).[1] These complaints were brought by Shankman's creditors and former investors, alleging Shankman's bad conduct, such as fraud, conversion, or intentional misrepresentations. These adversary proceedings, save one, were eventually resolved without exceptions to discharge.

The Trustee filed an objection to Shankman's claim of exemptions (docket #19) on December 12, 2008. The objection, in essence, complains that Shankman failed to provide adequate information to substantiate the value of his scheduled assets and claimed exemptions. The objection focuses on an IRA fund from a previous employer (the "IRA"). Shankman responded (docket #27), principally by reaffirming his contention that the IRA and other assets have no value.

On March 13, 2009, the Trustee moved to compel Shankman to produce certain documents related to the claimed exemptions, and requested a 2004 examination (docket #57),

---

[1] Adversary Proceeding Nos. 08-03482 *Incline Materials LLC v. Shankman*; 09-03021 *Mid Atlantic Blended Products, Inc. v. Shankman*; 09-03022 *Proshan v. Shankman*; and 09-03023 *Zweig v. Shankman*.

which the Court granted (docket #62). Contemporaneously, the Trustee filed Adversary Proceeding No. 09-03113 (the "Adversary"), objecting to Shankman's discharge under 11 U.S.C. §§ 727(a)(2),(a)(3),(a)(4), and (a)(5). Complaining of conduct similar to that alleged in previously filed adversaries, the Trustee also asserted that Shankman had made a false oath or account, withheld information relating to his property and financial affairs, concealed, destroyed, falsified or failed to keep financial information, or explain satisfactorily any loss of assets or deficiency of assets. The crux of the Trustee's complaint was the mysterious disposition of artwork and other property listed as assets in Shankman's divorce decree but omitted from his bankruptcy schedules, and Shankman's alleged "conscious act[s]…to withhold information from the Trustee." (Adv No. 09-03113, docket #1).

One day prior to the response deadline for the motion to compel, Shankman's attorney emailed several of the requested documents, responding that "partial production" had occurred (Bankr. Case No. 08-36327, docket # 61). Unsatisfied by Shankman's allegedly "woefully inadequate" production, on June 16, 2009 the Trustee filed a motion for sanctions (docket # 65) in response to Shankman's continuous recalcitrance in providing information, and his absolute failure to comply with the Court's order compelling production.[2] After a lengthy and contentious hearing, the Court found that Shankman had not responded in a comprehensive and organized way to the Court's order requiring production of the requested documents, and imposed civil sanctions in the amount of $5,000 (docket #79, the "Contempt Order").

On October 15, 2009, the Court consolidated the Trustee's objection to exemptions (docket #65) and the Adversary (docket #81). With leave of Court, the Trustee also amended his objection to exemption to incorporate the allegations that Shankman allegedly failed to provide

---

[2] The Trustee also filed a motion to compel production in the Adv. No 09-03113, citing Shankman's complete failure to produce any documents requested in the Trustee's objection to Shankman's discharge (docket #13). This motion was consolidated with the motion to compel in the bankruptcy case.

2 / 15

documentation and allegedly misappropriated certain property. Trial of all issues was scheduled to commence on December 8, 2009.

### *The Application to Compromise Controversy*

On the day of trial, Counsel for the Trustee and Counsel for Shankman announced that a settlement had been reached on both the objection to exemptions and the objection to discharge. The details of the settlement were still being worked out, but the parties had agreed that Shankman would pay the Trustee $100,000 within ten months, Shankman would turn over any and all artwork that was transferred in 2007, and in return, the Trustee would release all claims raised in the objection to exemption and the Adversary. Judge Steen informed the parties that while dropping the objection to exemptions may be appropriate, he had serious public policy concerns with respect to the Trustee's release of the objection to discharge under § 727 in exchange for a monetary payment. The Trustee argued that there was a great risk that the Trustee would lose the § 727 claims while incurring substantial expense to the estate. Judge Steen responded:

> …I think the Trustee has a dual duty. I think the Trustee has a duty to the estate, but I think the Trustee also has a duty to the process….
>
> …and you know, when [the Trustee] tells me no harm, no foul, that raises this specter that there's been a buyout of the 727 claim…
>
> …I will tell you that I will probably not approve the settlement merely on negative notice. So it's probably going to require a hearing. And it will probably -- what I will probably require at the hearing is an explanation of why, as a matter of public policy, dismissal of the 727 action, irrespective of any monetary payment, is appropriate. And I think the only way you can meet that burden is to tell me that there is a substantial risk in proving what you need to prove.

Transcript of Hearing in Adv. No. 09-03113, December 8, 2009, pages 12-13, 17.

The Trustee filed a 9019 Application to Compromise Controversy, setting forth the terms of the proposed settlement (docket # 94). The terms of the settlement were similar to those announced at trial. In addition, however, the Trustee argued that there was substantial risk in the continued prosecution of the claims, and that overall, the Trustee believed the Creditors would benefit the most by Shankman's payment of $100,000 to the estate. Furthermore, the Trustee argued, although settlements of § 727 actions are subject to close scrutiny, the Court should be reluctant to apply a hard and fast rule when settlement is in the best interests of the estate.

The 9019 Motion was set for hearing on February 1, 2010. Two letters objecting to the compromise (docket #103 and docket # 104) were filed by former investors. At the request of Judge Steen, the hearing was conducted by the undersigned judge.

## *Jurisdiction*

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(N). Venue is proper under 28 U.S.C. § 1409.

## *Law*

Federal Bankruptcy Rule 9019 authorizes bankruptcy courts to approve compromises and settlements.[3] Ultimately, a compromise must be "fair, equitable, and in the best interest of the estate." *In re Jackson Brewing Co.,* 624 F.2d 599, 602 (5th Cir. 1980) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)).

When considering whether a compromise is "fair, equitable, and in the best interest of the estate," the Court must weigh the "terms of the compromise with the likely rewards of litigation." *Id.* Within the 5th Circuit, courts must consider:

---

[3] The Rule provides: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." Fed. R. Bankr. P. 9019(a).

- The probability of success in the litigation, with due consideration for the uncertainty in fact and law,

- The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

- All other factors bearing on the wisdom of the compromise.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. ( In re Cajun Elec. Power Coop.*), 119 F.3d 349, 356 (5th Cir. 1997); *Jackson Brewing,* 624 F.2d at 602.

The 5th Circuit has articulated two additional specific factors from the general "bearing on the wisdom of the compromise" factor:

- Whether the compromise serves "the paramount interest of creditors with proper deference to their reasonable views." *Cajun Elec.,* 119 F.3d at 356; *In re Foster Mortgage Corp.,* 68 F.3d 914, 917 (5th Cir. 1995) (citing *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir. 1929)). When applying this factor, courts generally consider the consideration offered by the settling party and the degree to which creditors object. *See Cajun Elec.,* 119 F.3d 349; *Foster Mortgage,* 68 F.3d 914; *U.S. v. AWECO, Inc.,* 725 F.2d 293 (5th Cir. 1984).

- "[T]he extent to which the settlement is truly the product of arms-length bargaining and not of fraud or collusion." *Foster Mortgage,* 68 F.3d at 918.

The Trustee bears the burden of establishing that the balance of the above factors supports a finding that the compromise is fair, equitable and in the best interest of the estate. *In re Lawrence & Erausquin, Inc.,* 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990) (citing *In re Hermitage Inn, Inc.,* 66 B.R. 71, 72 (Bankr. D. Colo. 1986)); *In re GHR Cos., Inc.,* 50 B.R. 925, 931 (Bankr. D. Mass. 1985). "[C]ompromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Cajun Elec.,* 119 F.3d at 354 (quoting *Jackson Brewing,* 624 F.2d at 602). Accordingly, the Trustee's burden is not high. The Trustee need only show that his decision falls within the "range of reasonable litigation alternatives." *In re W.T. Grant Co.,* 699 F.2d 599, 608

(2nd Cir. 1983), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97; *Cook v. Waldron,* 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006); *Nellis v. Shugrue,* 165 B.R. 115 (S.D.N.Y. 1994).

The decision to approve a compromise "lies within the discretion of the trial judge." *AWECO,* 725 F.2d at 297. The Court need not "conduct a mini-trial to determine the probable outcome of any claims waived in the settlement." *Cajun Elec.,* 119 F.3d at 355. However, the Court must actually use its discretion. The Court cannot "simply accept the trustee's word that the settlement is reasonable, nor may he merely 'rubber-stamp' the trustee's proposal." *In re Am. Reserve,* 841 F.2d 159, 162 (7th Cir. 1987) (quoting *TMT Trailer,* 390 U.S. at 434, 88 S.Ct. 1157). The Court "must be informed of all the relevant facts and information in order to make an independent judgment as to whether the settlement is fair and reasonable under the circumstances." *Cook,* 2006 WL 1007489 at *4. *See also Jackson Brewing,* 624 F.2d at 602 ("To assure a proper compromise the bankruptcy judge must be apprised of all the necessary facts for an intelligent, objective and educated evaluation.").

*Analysis*

The Court recognizes that the objection to exemptions and the adversary proceeding that is subject to the 9019 Application to Compromise are complex and fact intensive. The Trustee would undoubtedly face numerous hurdles and expense prosecuting these actions, even if Shankman was fully cooperative in the discovery process. Nevertheless, the Court cannot approve the compromise. The purported benefits to the estate are illusory and the proposed compromise is against public policy.

1. *The Benefits to the Estate are Wholly Illusory*

The Court finds that the promised benefits to the estate are wholly illusory. The success of the settlement is hinged on the payment of $100,000 by Shankman to the Trustee. At the

hearing on February 1, 2010, the parties informed the Court that the source of this payment would be derived from Shankman's hoped-for future income once Mr. Shankman resumed his long-suspended professional practice. Shankman's profession is in corporate finance. To practice his profession, he requires a license. The parties advised the Court that Shankman is presently unable to obtain a license and resume his practice due to the contempt and sanctions order entered by Judge Steen.[4] Therefore, the Trustee and Shankman announced their intention to file a motion to vacate the contempt order so that Shankman can obtain the necessary license and earn money to pay the $100,000 settlement payment over a ten month period.

There will be no benefits to the estate unless Mr. Shankman earns income. Mr. Shankman cannot earn income unless he obtains a license. Mr. Shankman will be unable to obtain a license unless Judge Steen vacates the contempt order.

A federal judge should not vacate a sanctions or contempt order for the purpose of conferring a pecuniary benefit to the contemnor. If the contempt or sanctions order was improvidently entered, then it should be vacated. But, if the purpose of vacating the order is to mislead financial regulatory authorities into believing that a license applicant did not act in contempt or did not engage in sanctionable behavior, then the Federal Court would become a knowing participant in wrongful conduct.

The Court is guided in this decision by the wisdom of the Supreme Court's decision in *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S. Ct. 2447 (1990). The principal issue in *Cooter & Gell* was whether the dismissal of a complaint pursuant to Fed. R. Civ. P. 41 should terminate a federal court's ability to consider the imposition of Rule 11 sanctions. The Court held that termination of the cause of action did not terminate the Court's ability to impose Rule

---

[4] Docket #79, Bankr. Case No. 08-36327.

11 sanctions. *Id.* The Court emphasized that the purpose of sanctions was to protect the judicial system. *Id.* The fact that the dispute between the parties was dismissed did not terminate the federal court's interest. *Id.*

Although the present situation differs from *Cooter & Gell,* the policy concerns are largely the same. The extension of *Cooter and Gell* into private settlements of sanctions orders was best explained in a 1992 decision by the Eighth Circuit Court of Appeals. In that decision, the parties settled and plaintiff and defendant jointly moved (as part of the settlement) to "drop the sanction order." *Perkins v. General Motors Corp,* 965 F.2d 597, 599 (8th Cir. 1992). The sanction order was issued under Rules 11 and 26 and under 28 U.S.C. § 1927. *Perkins* at 600-01  The district court refused to grant the motion. The parties sought mandamus to require the district judge to implement the agreed settlement. The Eighth Circuit explained that:

> The purpose of sanctions goes beyond reimbursing parties for expenses incurred responding to unjustified or vexatious claims. Rather, sanctions are 'designed to punish a party who has already violated the court's rules.' *Willy,* 112 S.Ct. at 1081. The interest of having rules of procedure obeyed does not disappear merely because an adversary chooses not to collect the sanctions.

*Perkins* at 599.

The Court further held that the parties "cannot unilaterally bargain away the court's discretion in imposing sanctions and the public's interest in ensuring compliance with the rules of procedure." *Perkins* at 600.

The Fifth Circuit has both adopted and clarified Perkins. *Fleming & Associates v. Newby & Tittle,* 529 F.3d 631 (5th Cir. 2008). There are three critical holdings in *Fleming* that apply to this case.

First, the Fifth Circuit adopts and quotes *Perkins,* holding that "[a]ppellants are entitled to bargain with adversaries to drop a motion for sanctions, but they cannot unilaterally bargain

away the court's discretion in imposing sanctions and the public's interest in ensuring compliance with the rules of procedure." *Fleming* at 641.

Second, the Fifth Circuit held that private parties may agree not to collect compensatory sanctions payable by one party to the other. *Id.* In the present case, the sanctions were payable to "the Trustee for costs of this proceeding." Accordingly, this Court holds that under *Fleming* the Trustee may (subject, of course, to the requirements of Rule 9019) settle his ability to collect the $5,000.

Third, the Fifth Circuit held that the sanctions order in *Fleming* could not be vacated in order to avoid the reputational damage to the sanctioned party. *Id.* In the present case, the parties seek to vacate the sanctions order for a reason closely analogous to reputational injury. The small $5,000 sanction is not the issue; it is the order itself that is of concern to Shankman. Shankman's "reputation" (as found by a federal court) is apparently considered by licensing agencies designed to protect the public interest. The facts of this case are more compelling than in *Fleming* and strongly militate against vacating the sanctions award.

Neither Shankman nor the Trustee allege that Judge Steen's order was improvidently issued. This Court has no doubt that Judge Steen will respect the sanctity of the Federal Courts and follow binding Fifth Circuit precedent. The Court concludes that the probability that Judge Steen's order will be vacated for the purpose of misinforming the licensing agency is non-existent.

Accordingly, the notion that the estate will receive $100,000 out of Mr. Shankman's future earnings, which is contingent on his licensing, makes the benefits wholly illusory.

2. *Shankman's Continuing Conduct is Unsatisfactory and Inexcusable*

The Contempt Order was entered on October 8, 2009 following a lengthy and contentious hearing. That order became final ten days later. But by the time of the hearing on the Application to Compromise on February 1, 2010, the sanctions mandated by the Contempt Order had still not been paid.

Mr. Shankman has not provided a valid or compelling excuse for this failure. By not paying the contempt sanctions, the Court finds Mr. Shankman shows a continuing disregard of his duties, and a continuing lack of respect for the Court and for the process. In addition, the Court further finds it extraordinary that Shankman would then request the Court to use its equitable powers to vacate the sanctions order for his pecuniary benefit.[5]

2. *The Trustee Failed to Convince the Court that the Claims Under § 727 Would Not Prevail.*

In the Application to Compromise Controversy and at the hearing, the parties argued that the payment of the $100,000 was attributable only to the exemptions objection, and not to the claims under § 727 or any future claims under § 541. The Trustee also testified that he had failed to find the 'smoking gun,' and that there was a substantial risk that his claims under § 727 would not prevail.

Despite the parties' characterization, the Court has concluded that the proposed compensation is attributable to the § 727 causes of action. The testimony at the hearing on the motion to compromise reflected that Shankman has colorable defenses to the objection to exemptions. There was substantial testimony that could lead a reasonable fact finder to conclude

---

[5] The Court also observes that the Trustee passionately argued for entry contempt order and sanctions. To now join the request for the vacating of that order in for the purpose of obtaining payment of a settlement is inconsistent with vindicating the contempt issue.

that Shankman would prevail on the exemption dispute. Conversely, there was no testimony that demonstrated weakness in the Trustee's complaint arising under § 727.

Mr. Shankman simply failed to disclose the transfers of art listed in his divorce decree in his bankruptcy schedules. This omission alone seems actionable. Furthermore, the timing and the location of the transfers was not disclosed until after the adversary proceeding was filed. Mr. Shankman did not provide a valid or compelling excuse for this failure at the hearing on February 1, 2010. Upon inquiry by the undersigned judge, the timing of the transfers of art to his step-father and the excuse for this failure to disclose the transfers changed within the course of fifteen minutes of testimony:

| Time | Speaker | Statement |
|---|---|---|
| 2:21:48 | Court: | "So what occurred in December of '07?" |
| | Shankman: | "I think, what happened was that my step-father had taken money from his IRA, and I didn't know the money was coming his IRA. I guess because he was getting closer….he was either closer to retirement, or the fact that we thought could, or I thought could be able to, um, ultimately get his money back for him through whatever course of my businesses were. And I think what it was is, that he had incurred substantial tax liabilities, that I found out after, and I think he wanted some sort of asset or something, to make sure that it wasn't going to be he that was going to be on the hook for whatever dealings or business that I had." |
| | Court: | "So he took money out of his IRA, then understood that he had to pay some taxes on it, right? Or is there some other event that occurred in December of '07? |
| | Shankman: | "I don't remem.." |
| … | | |
| 2:23:35 | Court: | "Okay, so then what happened in December of '07?" |
| | Shankman: | "I think he had, we had agreed, or we had discussed that when he took money of his accounts prior to '06, or up into '06, that he was going to get the money back, obviously, within 60 days, or we would try to replace it within 60 days. And if it didn't' happen, he |

| Time | Speaker | Statement |
|---|---|---|
| | | would have to be further secured. I think we didn't execute the further security until '07. But those assets….he and I had an understanding would be his anyway. So some of it, I think, was, um, I guess subject to a different oral agreement that we had that we subsequently wrote." |
| 2:24:01 | Court: | "So at some point prior to December of '07 did you transfer the physical possession of the artwork to [your step-father]?" |
| | Shankman: | "Some of it yes. Most of it actually." |
| | Court: | "But there was some that you transferred physical possession of in December of '07?" |
| | Shankman: | "There were a couple of pieces." |
| … | | |
| 2:25:24 | Court: | "So in December of '07, what did you do?" |
| | Shankman: | "So [the step-father] physically received a lot of, or many of the, um….a couple of the smaller assets were transferred prior in the years when he took out money from his IRA. In December of 07' several others were physically given to him at that time." |
| | Court: | "And what documents did you execute in December of '07?' |
| | Shankman: | "Um, we had a, uh, I guess I would call it a sales agreement. And the sales agreement stipulated what the items where, the amount, and why they were being sold to him at that time. Or had been sold to him prior to it. |
| … | | |
| 2:29:16 | Court: | "So this didn't all happen at one time in December of '07, but over a number of days in December of '07?" |
| | Shankman | "Well the art had been delivered in previous years. Over the course of executing those documents, I think it was probably over some amount time, yes." |
| … | | |
| 2:39:58 | Court: | "All right. So when was the last time that you transferred art to your step-father prior to December of 2007?" |
| | Shankman: | "Physically?" |

| Time | Speaker | Statement |
|------|---------|-----------|
|  | Court | "Physically or on paper." |
|  | Shankman: | "Probably in '06, then, I would say sometime." |
|  | Court: | "Beginning of '06?  The end of '06?" |
|  | Shankman: | "You know, whatever asset sales where done, they were documented, and that's where they would be reflected." |
|  | Court: | "I'm having trouble understanding how you can forget, then, the December of '07 transactions." |
|  | Shankman: | "Well, it isn't a question of forgetting, it was a question of… I never knew the total amount of his tax liability. Whatever art I had left in my physical possession, he either wanted delivered to him, or if it was too expensive to ship, he said, 'keep it, and we'll figure it out.'" |
|  | Court: | "So why didn't you disclose that on your papers?" |
|  | Shankman: | "Because I didn't realize – because anything – there was no other…um…there was no assets that I owned …by then.  And I think a lot of those…his last tax disbursement was in '06.  So it wasn't a question of not disclosing it.  I think it was disclosed in our first meeting." |

Recorded Hearing, Case No. 08-36327, held on February 1, 2010.

Mr. Shankman's testimony was not credible.  Mr. Shankman initially testified that he did not remember the specific dates of the transfers.  The last answer that he gave regarding his failure to disclose the transfers was not that he forgot when they took place, but rather because he thought he didn't think it had to be disclosed at all.

The transfers were not disclosed, at all, in clear violation of § 727.  The Court will not permit Shankman to lie on his schedules, lie to the Court, then grant Shankman the benefits of the Court's discretion.

Shankman's failure to turn documents over to the trustee—after repeated requests—resulted in the imposition of sanctions by the Bankruptcy Court. Although such a failure need not result, *per se,* in a denial of Shankman's discharge, they are powerful evidence that support the Trustee's allegations that the discharge should be denied pursuant to § 727(a)(4)(D).

3. *Any Monies Received Will Go Only to the Trustee*

The Trustee believes that the creditors will benefit from the proposed settlement. However, any money that comes in will go to pay administrative claims. The only admissible evidence before the Court—and the Trustee's best estimate—suggests that the artwork to be transferred to the Trustee is worthless. The $100,000 payment is illusory for reasons set forth above. Therefore, any money derived from the estate will not flow to any creditor other than an administrative creditor (that is to say, the Trustee).

Moreover, in the unlikely event that the $100,000 is recovered, it is highly unlikely that it will produce any meaningful distribution to Shankman's pre-petition creditors. The funds will be used to pay the Trustee and his counsel.

The Court recognizes that payment of the Trustee and his counsel is a legitimate goal. But, the relief requested in the Trustee's motion goes several steps too far. The Trustee requests that the Court stretch its equitable judgment solely for payment to the Trustee. Conversely, if Shankman's discharge were denied, there would be (at least some possibility) that creditors could collect on their non-discharged judgments. In the end, the Trustee requests that the Court discharge the legitimate claims of creditors (when Shankman appears not to deserve a discharge) in exchange for compensating the Trustee. The Court will not pervert its discretion in that fashion.

When examining a motion to compromise controversy under FED. R. BANKR. P. 9019, the Court must look to the reasonable views of the creditors affected. *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.* ( *In re Cajun Elec. Power Coop.*), 119 F.3d 349, 356 (5th Cir. 1997). In this case, there is only one creditor that supports the compromise. The claims held by that creditor have already been excepted from discharge. If Shankman receives a discharge, then the only non-discharged debt will belong to the supportive creditor. The Court concludes that the supportive creditor's support is unrelated to any benefit to the estate and that his interests are diametrically opposed to the estate's interests. The only other two creditors who have expressed a view are strenuously opposed to the settlement, because it is absolutely clear that they will not receive any benefit under the proposed compromise.[6] These affected creditors deserve to have the Trustee prosecute the § 727 causes of action, especially since the settlement offers no tangible benefit to any creditor of the estate.

## *Conclusion*

In the unlikely event the $100,000 does come into the estate, the Court finds that the settlement may be a fair compromise of the non–§ 727 causes of action. Therefore, the Application to Compromise Controversy is denied without prejudice. The parties may propose an alternative compromise consistent with this opinion.

SIGNED **March 2, 2010.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

---

[6] *See* docket ## 103 and 104.